UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- X
                                  :

MAURICE STEPHEN,               :  Case No.: 23-cv-1519
                                  :

              Plaintiff,    :    **COMPLAINT**
                                  :       **AND**
        – against –        :  **JURY DEMAND**
                                  :

COINBASE, INC., and          :
CROSS RIVER BANK,          :
                                  :

             Defendants.    :
                                  :

-------------------------------------------------------------------- X

## PRELIMINARY STATEMENT

1.     Plaintiff, Maurice Stephen ("Mr. Stephen"), brings this action against Coinbase, Inc. and Cross River Bank, the Defendants, for damages arising out of Defendants' violations of the Electronic Fund Transfer Act, 15 U.S.C. § 1693 *et seq.* ("EFTA") and the rules and regulations thereunder; New York General Business Law § 349; New York Uniform Commercial Code Article 4-A, and state common law. Mr. Stephen was the victim of a sophisticated scam in which he was deceived by fraudsters into transferring his life's savings to a Coinbase account at Cross River Bank that the fraudsters set up under Mr. Stephen's name. Coinbase is a platform that allows customers to store, deposit, withdraw, transfer, buy, and sell digital currencies.

2.     After Mr. Stephen transferred the money, the fraudsters accessed his Coinbase account without his authorization, permission or knowledge, used $140,195 of Mr. Stephen's money to purchase 3.264707 Bitcoin, a digital currency, and then transferred the Bitcoin out of Mr. Stephen's account. Defendants failed to flag suspicious activity on Mr. Stephen's account

and allowed the unauthorized transfers to occur even after Mr. Stephen changed his password and placed a restriction on the account. Despite Mr. Stephen's numerous and prompt efforts to dispute the fraud, Defendants failed to conduct a reasonable investigation, failed to timely report the results of its investigation, and misrepresented to Mr. Stephen that he was liable for the unauthorized transactions from his account.

3.    Mr. Stephen is a 70-year-old Queens resident who has worked and carefully saved his money for several decades. He finally retired in 2018 and planned to live off the money he had saved.

4.    Mr. Stephen's hard work and careful planning were destroyed when he became the victim of a sophisticated identity theft scheme that cost him his life's savings.

5.    On February 28, 2022, Mr. Stephen's computer froze and a message popped up instructing him to call Microsoft. He called the number provided in the pop-up and spoke with an individual who claimed to be a Microsoft employee. The "Microsoft employee" connected to Mr. Stephen's computer and informed Mr. Stephen that his computer was compromised. The "Microsoft employee" also told Mr. Stephen that his bank information was compromised and connected Mr. Stephen to an individual who claimed to be a Bank of America Fraud Department employee. The "Bank of America employee" said that Mr. Stephen's account was compromised and after allegedly conducting an investigation, the "Bank of America employee" told Mr. Stephen that in order to protect his money, he needed to transfer all of it to a secure account at Cross River Bank.

6.    Believing his life's savings was at risk, Mr. Stephen did as the fraudsters instructed and on March 8, 2022, he transferred all of the money in his Bank of America account, amounting to $140,200, to a Coinbase account at Cross River Bank that the fraudsters had set up

under Mr. Stephen's name. The fraudsters provided Mr. Stephen with the login information. Mr. Stephen logged in to the account, which was under his name and email address, and could see the money he had deposited into the account. He then immediately changed his password. Mr. Stephen did not share his password with anyone, and was unaware of anyone else accessing his account.

7.      On March 9, 2022, without Mr. Stephen's knowledge or permission, the fraudsters accessed Mr. Stephen's account and used $140,195 of Mr. Stephen's money to purchase 3.264707 Bitcoin, which is a type of digital currency, or cryptocurrency.

8.      On March 10, 2022, Mr. Stephen started to feel suspicious and worried about protecting his life's savings. He called Coinbase using the phone number he found on the website, but he was not able to get through to a live person; the call was simply an automated process that directed him to the Coinbase website. Mr. Stephen hung up the phone, logged in to his account online, changed his account password again, and used Coinbase's online customer service process to answer a series of questions and place a restriction on his account. At this point, Mr. Stephen could see all of the money in his account; he did not know the fraudsters had logged in to his account or that they had already used almost all of his money to purchase Bitcoin.

9.      On March 16, 2022, the fraudsters transferred all of the Bitcoin out of Mr. Stephen's account. Mr. Stephen had no knowledge of this unauthorized transfer until March 17, 2022, when he logged in to his account and saw that almost all of his money was gone. Law enforcement later informed Mr. Stephen that the fraudsters transferred the Bitcoin to L Bank, another platform for storing and exchanging cryptocurrency.

10.     Mr. Stephen promptly reported the crime to the New York City Police Department ("NYPD") and the Federal Bureau of Investigation. The NYPD referred his case to the Financial Crimes Task Force for further investigation and a detective from the Task Force took two of Mr. Stephen's computers to review as evidence. Mr. Stephen also contacted Bank of America, which initially represented that it had recalled the funds and would return them to Mr. Stephen. When Mr. Stephen did not receive the funds in his account, he followed up with Bank of America, which then said that the recall was not successful. Mr. Stephen called Cross River Bank to report the crime and a Cross River employee told him someone from the Legal Department would follow up with him, but no one ever did. Mr. Stephen followed up with a written dispute. Cross River responded months later and instructed Mr. Stephen to contact Coinbase. Mr. Stephen submitted numerous complaints to Coinbase, including an online complaint and a formal complaint. Coinbase denied his complaints, stating that cryptocurrency transactions are irreversible and that the account was set up using Mr. Stephen's personal information and Coinbase had no reason to suspect the transactions were unauthorized.

11.     Despite Mr. Stephen's numerous attempts to dispute this fraud, Defendants have repeatedly denied his claims and refused to reimburse the stolen funds.

12.     The transactions at issue were made without Mr. Stephen's knowledge or permission. And taken as a whole, the circumstances regarding Mr. Stephen's account should have raised suspicion. The account belonged to an elderly individual who had never purchased cryptocurrency before. Within only a few days, the account was opened, $140,200 was transferred into the account, nearly all of the money was used to purchase Bitcoin, Mr. Stephen placed a restriction on the account, there were several failed log in attempts, and then all of the Bitcoin was transferred out of the account to a cryptocurrency exchange based overseas. Taken

together, these circumstances should have raised red flags and indicated to the Defendants that the transactions were fraudulent. Defendants should not have allowed these transfers to occur and once they did occur, they should have taken prompt steps to investigate and release Mr. Stephen from liability for the fraud.

13.     In failing to address the fraud on Mr. Stephen's accounts, Defendants violated the EFTA; New York General Business Law § 349; New York Uniform Commercial Code Article 4-A, and state common law. Defendants' improper conduct includes holding Mr. Stephen liable for the unauthorized transfers, failing to conduct reasonable investigations into the fraud, failing to complete and report the results of their investigations, failing to provisionally credit Mr. Stephen's account, failing to provide documentation regarding their investigations, misrepresenting to Mr. Stephen the Defendants' responsibilities under the EFTA, and misrepresenting to Mr. Stephen that he is liable for unauthorized transfers that result from negligence or that were not known by the financial institution to be unauthorized.

## THE PARTIES

14.     Plaintiff Maurice Stephen lives at 183-12 145th Avenue, Springfield Gardens, New York 11413.

15.     Mr. Stephen is a "consumer" for the purposes of 15 U.S.C. § 1693a(6) of the EFTA and Regulation E, 12 C.F.R. §§ 205.2, 1005.2, because he is a natural person who has an account held by a financial institution.

16.     Defendant Coinbase, Inc. ("Coinbase") is an online platform for storing, buying, and selling cryptocurrency. Coinbase provides consumers with Digital Asset Wallets, which are accounts for holding digital assets such as Bitcoin, as well as USD Wallets, which is the term Coinbase uses to refer to accounts holding U.S. dollars.

17.    Defendant Cross River Bank is a New Jersey state-chartered bank.

18.    Coinbase is a customer of Cross River Bank and, upon information and belief, Cross River Bank provides Coinbase with custodial services as well as infrastructure for exchanging fiat currency for cryptocurrency and vice versa.

19.    Customers can use their Coinbase USD Wallets to hold and transfer U.S. dollars. Customers can load funds to their USD Wallets from bank accounts via wire transfer or ACH, which is an electronic fund transfer between banks across the Automated Clearing House network. Per Section 2.8 of the Coinbase User Agreement, when customers load funds to their USD Wallets, the cash balance is maintained in pooled custodial accounts at an FDIC-insured bank.[1] According to Coinbase, as of August 2022, Cross River Bank is one of five banks at which Coinbase currently deposits customer funds.[2]

20.    Cross River Bank and Coinbase are both "financial institutions," as defined by the EFTA, 15 U.S.C. § 1693a(9), and Regulation E, 12 C.F.R. §§ 205.2(i), 1005.2(i), because they directly or indirectly hold accounts belonging to consumers and because they issue access devices and provide electronic fund transfer services.

**JURISDICTION AND VENUE**

21.    This Court has subject matter jurisdiction under the Electronic Fund Transfer Act, 15 U.S.C. § 1693 *et seq.*  Civil actions brought under the EFTA may be commenced in any United States District Court without regard to the amount in controversy. 15 U.S.C. § 1693m(g).

22.    This Court also has subject matter jurisdiction pursuant to 28 U.S.C. 1332(a) because the damages suffered by Mr. Stephen exceed $75,000 and the controversy is between

---

[1] Coinbase, *Coinbase User Agreement*, https://www.coinbase.com/legal/user_agreement/united_states (last updated Dec. 15, 2022).
[2] Coinbase, *How is Coinbase Insured?*, https://help.coinbase.com/en/coinbase/other-topics/legal-policies/how-is-coinbase-insured (last visited Feb. 21, 2023).

citizens of different states. Mr. Stephen is a citizen of New York, Cross River Bank is a corporate citizen of New Jersey, and Coinbase is a Delaware company with its principal place of business in California.

23.     This Court has supplemental jurisdiction over Mr. Stephen's claims under New York State General Business Law § 349, New York Uniform Commercial Code Article 4-A, and New York State common law because they are "so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." *See* 28 U.S.C. § 1367(a).

24.     Venue is proper because Defendants conduct business in this district. Cross River Bank does business at a branch located at 2365 Nostrand Avenue, Suite B, Brooklyn, NY 11210, located in the Eastern District of New York. Coinbase is regulated and licensed as a money remitter by the New York State Department of Financial Services.

25.     Venue in this District is also proper because all or a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in Queens County.

## **FACTS**

26.     Mr. Stephen moved to the United States from Belize in 1971 with the hope of furthering his education. He worked part-time to put himself through school. Beginning in the 1980s, Mr. Stephen started slowly and carefully saving money for retirement. In 1981, he began work as an electrician for what was then Conrail and later became Metro-North Railroad. Concerned by the number of his colleagues who were injured or killed on the job, Mr. Stephen left Metro-North in search of a safer profession. In the early 1990s, he started to work as a TV and electronics technician. He also enrolled in courses to receive his certification in network engineering. Mr. Stephen graduated in 1995 and worked for the next twenty years as a media and

network engineer setting up internet lines for various internet access providers. Mr. Stephen

retired in 2018 due to a back injury that he sustained while working.

27.     In 2008, Mr. Stephen started to save his money in retirement accounts provided

by his employer. In 2019, he opened a bank account at Bank of America and rolled over all of

his retirement savings into two IRAs at Merrill Lynch. In 2021, when he received an insurance

settlement for a back injury, he used some of the money for home repairs, deposited a portion in

his Bank of America account, and used the rest to open two other investment accounts at Merrill

Lynch. After careful saving, he accumulated almost $155,000 in his four Merrill Lynch accounts

and approximately $15,000 in his Bank of America account. Mr. Stephen opened these accounts

primarily for personal, family, and household purposes and intended to live off these funds in

retirement.

## Background on Cryptocurrency

28.     Cryptocurrencies, also known as virtual or digital currencies, are a type of

encrypted and decentralized digital asset.

29.     Bitcoin is among the most popular and widely known cryptocurrencies, with each

Bitcoin currently worth more than $20,000. Bitcoin are limited in quantity because they must be

"mined" by users through a complex computing process.

30.     As a result of Bitcoin's scarcity and cryptographic protection, it has come to

function as a medium of exchange similar to the U.S. dollar. It can be used to purchase goods

and services from a wide range of businesses, including, for example, AT&T, Chipotle, and

Whole Foods. Bitcoin and other cryptocurrencies are even used by some employers to pay

salaries. However, unlike the U.S. dollar, there is no bank or central authority that manages

Bitcoin's value.

31.     Unfortunately, as cryptocurrency has risen in popularity, its decentralized nature has created an attractive environment for scammers. In 2021, the FBI's Internet Crime Complaint Center received 34,202 complaints involving a crypto-asset, reporting total losses of over $1.6 billion.[3] Common scams include solicitations to invest in fraudulent schemes, romance scams, and business and government impersonation scams.[4]

## Coinbase

32.     Coinbase is one of many financial institutions that have emerged to provide consumers with platforms for storing, buying, selling, and managing cryptocurrency.

33.     Coinbase provides consumers with Digital Asset Wallets, which are accounts for holding digital assets such as Bitcoin, as well as USD Wallets, which are accounts for holding U.S. dollars. Consumers may use the platform to buy and sell digital assets, withdraw funds, and more. When users load money to their USD wallets, Coinbase stores that cash in pooled custodial accounts at one of five FDIC-insured banks, including Defendant Cross River Bank. These banks provide wire transfer services and other infrastructure to enable Coinbase to convert cryptocurrency into fiat currency and vice versa.

34.     Coinbase is the largest institution of its kind, purporting to have 110 million customers and $80 billion worth of assets on its platform.[5] Yet despite its growing popularity in recent years, Coinbase has failed to keep up with the increasing need for account protections and services. Coinbase has allowed scams and fraud to proliferate on its platform by taking

---

[3] U.S. Department of the Treasury, *Crypto-Assets: Implications for Consumers, Investors, and Businesses* 26–27 (Sept. 2022), available at https://home.treasury.gov/system/files/136/CryptoAsset_EO5.pdf.
[4] Federal Trade Commission, *Consumer Protection Data Spotlight: Reports show scammers cashing in on crypto craze* (June 3, 2022), *available at* https://www.ftc.gov/news-events/data-visualizations/data-spotlight/2022/06/reports-show-scammers-cashing-crypto-craze.
[5] Coinbase, *About*, https://www.coinbase.com/about (last visited Feb. 24, 2023).

inadequate measures to safeguard accounts and failing to provide recourse to customers who have been scammed.

## **The Fraud**

35.     On February 28, 2022, Mr. Stephen was on his computer when it suddenly froze. The computer started beeping and displayed a message warning him not to turn off his computer or he would lose all of his data. The message stated that his computer was compromised and instructed him to call Microsoft. Mr. Stephen called the number provided in the message and spoke to an individual who falsely said he was a Microsoft employee named Michael Moore. Mr. Stephen gave "Mr. Moore" access to his PC using a program called UltraViewer. After "Mr. Moore" connected to the PC, he told Mr. Stephen that his computer was compromised and he needed to download some software to fix it. Mr. Stephen could see that "Mr. Moore" was connected to his computer as "Microsoft PC 6" and seemed to be running system diagnostics and downloading what appeared to be antivirus software.

36.     After reviewing Mr. Stephen's computer, "Mr. Moore" told Mr. Stephen that he needed to check his Merrill Lynch and Bank of America accounts because they were also compromised. Mr. Stephen had not told "Mr. Moore" he had accounts at Merrill Lynch or Bank of America; "Mr. Moore" appeared to already know this. "Mr. Moore" represented that a company based in China had withdrawn $4,000 from Mr. Stephen's account. "Mr. Moore" said he would connect Mr. Stephen through a secure line to the bank. Mr. Stephen was connected to an individual who falsely claimed to be a Bank of America Fraud Department employee named Rick Taylor. "Mr. Taylor" told Mr. Stephen to log in to his Bank of America account so "Mr. Taylor" could review the account. Mr. Stephen logged in and "Mr. Taylor" confirmed the account was compromised and that two fraudulent transactions totaling $4,000 had been made

from his account. "Mr. Taylor" told Mr. Stephen he would look into the security issue and call Mr. Stephen back.

37.     Over the next week, "Mr. Moore" called Mr. Stephen every morning and often transferred Mr. Stephen to "Mr. Taylor." Both "Mr. Moore" and "Mr. Taylor" instructed Mr. Stephen to keep his computer on overnight. They represented that the FBI was working on the case and the computer needed to stay on so that they could continue to monitor it and work on resolving the security issue. They repeatedly warned Mr. Stephen not to say anything to anyone at Bank of America while the investigation was ongoing because the bank's security was compromised.

38.     During one conversation, "Mr. Moore" asked if Mr. Stephen had any other devices because "Mr. Moore" needed to check if they were also compromised. Mr. Stephen gave "Mr. Moore" access to two additional computers and his cell phone using remote desktop applications. Again, Mr. Stephen could see "Mr. Moore" connected to the computers and downloading what appeared to be antivirus software. "Mr. Moore" also said Mr. Stephen's landline was involved in the security issue and had Mr. Stephen call him from his landline several times. "Mr. Moore" represented that all of Mr. Stephen's devices were compromised and "Mr. Moore" continued to monitor two of Mr. Stephen's computers and his cell phone for approximately two weeks.

39.     In or around early March 2022, "Mr. Taylor" called Mr. Stephen to follow up regarding the investigation into the alleged security issue at Bank of America. "Mr. Taylor" said that in order to protect Mr. Stephen's money, Mr. Stephen needed to first transfer all of his funds from his four Merrill Lynch accounts to his Bank of America checking account, and then transfer the money in his Bank of America checking account to an account at Cross River Bank. "Mr.

Taylor" told Mr. Stephen that he had created an account under Mr. Stephen's name at Cross

River Bank so he could store his money in a "secure wallet." "Mr. Taylor" provided Mr. Stephen

with the bank and account information so Mr. Stephen could transfer the money. "Mr. Taylor"

assured Mr. Stephen that his money would be safe and would be sent back to Bank of America

by March 16, 2022, after the security issue at the bank was resolved. "Mr. Taylor" repeatedly

told Mr. Stephen not to worry and that he would not lose his money.

40.     Mr. Stephen did not personally take any steps to open an account at Cross River

Bank or Coinbase. He also did not provide "Mr. Taylor" with any personal documents, nor was

he shown any documents, and Mr. Stephen does not know what information "Mr. Taylor" used

to open the account under Mr. Stephen's name.

41.     Mr. Stephen did not know Coinbase was involved in the transfer until he provided

Bank of America with the account number "Mr. Taylor" had given him and Coinbase appeared

as the recipient on the Bank of America wire transfer documents. "Mr. Taylor" had told Mr.

Stephen that his money would be held at a secure wallet at Cross River Bank, so when Mr.

Stephen saw Coinbase as the recipient, he thought Coinbase would provide the secure wallet at

Cross River Bank. Mr. Stephen thought that keeping his money in a "secure wallet" simply

meant his money would be kept in a secure location; he did not think his money could be moved

to an account outside of Cross River Bank and he did not know that his money could be

converted to cryptocurrency. Mr. Stephen was under the impression that his money would

remain in a Cross River Bank account under his name.

42.     On March 7, 2022, Mr. Stephen did as "Mr. Taylor" instructed and transferred all

of the money from his four Merrill Lynch accounts to his Bank of America checking account

ending in 0754. Mr. Stephen had almost $155,000 in his Merrill Lynch accounts and $15,000 in

his Bank of America account, but after taxes were deducted from his Merrill Lynch accounts, he was left with a total of $140,200 in his Bank of America account. Then, on March 8, 2022, again at "Mr. Taylor's" direction, Mr. Stephen transferred $140,200.00, which was all of the money in his Bank of America checking account ending in 0754, to a Coinbase account ending in 1659 at Cross River Bank. Exhibit A p. 15 (Bank of America Funds Transfer Request Authorization).

43.     After the transfer, "Mr. Taylor" provided Mr. Stephen with the login information for Mr. Stephen's account. Mr. Stephen then logged in to the Coinbase account by entering his username, which was his email address, as well as the password "Mr. Taylor" had provided. Mr. Stephen could see the money he had transferred into the account. He changed his password and did not share it with "Mr. Taylor" or anyone else. He was unaware of anyone else accessing the account.

44.     During the course of the scam, Mr. Stephen googled "Michael Moore," "Rick Taylor," and "Cross River Bank" to confirm the fraudsters' representations were correct. It all checked out; Michael Moore came up as a Microsoft employee, Rick Taylor came up as a Bank of America employee, and Cross River Bank appeared to be a legitimate banking institution. When Mr. Stephen asked "Mr. Taylor" to confirm his identity, "Mr. Taylor" connected Mr. Stephen to his supervisor, "David Johnson," who alleged he worked in Merrill Lynch's Fraud Prevention Department. "Mr. Johnson" even emailed Mr. Stephen a Merrill Lynch invoice (Exhibit B) and provided Mr. Stephen with his phone number and Merrill Lynch email.

45.     Despite Mr. Stephen's efforts to verify the identities of the fraudsters, by March 10, 2022, he was feeling nervous that he had moved all of his life's savings and he started to suspect fraud. He tried to contact Coinbase but when he called the phone number listed on the Coinbase website, he was not able to get through to a human being and instead encountered an

automated process that just directed him to the Coinbase website. He hung up the phone, logged in to his Coinbase account, changed his password, and used Coinbase's online customer service process to answer a series of questions and place a restriction on his account. At the time he placed the restriction, he could see that all of his money was still in the account; he did not realize the fraudsters had already logged in to his account or that they had already converted his money to Bitcoin. He did not share his new password with anyone else and was unaware of anyone else accessing the account. He was under the impression that once he placed the restriction, his account was frozen and no one would be able to access the account until he unlocked it.

46.    March 10, 2022 was the only date on which Mr. Stephen reached out to Coinbase during the course of the fraud. However, from March 1 through March 13, 2022, Mr. Stephen received several emails from Coinbase and a few emails were sent from Mr. Stephen's email address to Coinbase. Mr. Stephen did not write any of these emails and had no knowledge of these emails. He did not see any of these emails to or from Coinbase because the fraudsters had access to his email and electronic devices and, upon information and belief, the scammers were intercepting communications from Coinbase and writing fraudulent emails on Mr. Stephen's behalf. Mr. Stephen did not see these emails to or from Coinbase until several weeks after the scam ended, when he found them in his spam folder. Mr. Stephen does not know what these emails from Coinbase or the case numbers referenced in the emails relate to. Exhibit A pp. 17–28 (Coinbase emails). One of the emails appears to show that the fraudsters contacted Coinbase Support for assistance on March 11, 2022 because the account sending option was restricted. *Id.* p. 26.

47.    On March 11, 2022, "Mr. Taylor" instructed Mr. Stephen to take a photo of his driver's license on his cell phone and hold up a sign that said "For Coinbase trading" in front of the camera on his computer. Mr. Stephen did as he was instructed. Mr. Stephen did not send these images to anyone but upon information and belief, the scammers could access them because they had access to Mr. Stephen's cell phone and computer. Mr. Stephen does not know why "Mr. Taylor" instructed him to take these particular steps, but it was Mr. Stephen's understanding that everything "Mr. Taylor" asked him to do was to ensure the security of his funds.

48.    On March 17, 2022, Mr. Stephen logged into his Coinbase account and discovered that almost all his money was gone. He tried to call "Mr. Moore" and "Mr. Taylor" but their numbers were no longer in service.

49.    After seeing the empty account, Mr. Stephen immediately reported the crime to the New York City Police Department. Exhibit A pp. 6–8 (police report). The police helped Mr. Stephen access a Coinbase printout that showed all of his account's active sessions and account activity (Exhibit C), as well as a transaction report for his Coinbase account (Exhibit A p. 16 (Coinbase transaction report)). This was the first time Mr. Stephen saw either of these documents.

50.    According to the Coinbase activity report (Exhibit C), there were several failed attempts to log in to Mr. Stephen's account, several of which occurred within the same day. Mr. Stephen did not have any difficulty logging in to his account and does not recall any instance in which his log in attempt was unsuccessful. Upon information and belief, these log in failures were attempts by the fraudsters to gain access to his account. According to the Coinbase transaction report (Exhibit A p. 16), the fraudsters succeeded in gaining access to Mr. Stephen's

account and on March 9, 2022, an unauthorized user accessed Mr. Stephen's account and purchased 3.264707 Bitcoin for $140,195.00. On March 16, 2022, an unauthorized user accessed the account and removed all of the Bitcoin from the account. The NYPD later informed Mr. Stephen that the scammers had transferred his money from Coinbase to L Bank, a cryptocurrency exchange with an operating office in Indonesia.

51.     Mr. Stephen did not make these Bitcoin purchases, did not authorize anyone else to make these purchases, and had no knowledge of these purchases until the police showed him the transaction report. He also did not remove the Bitcoin from his account, he did not authorize anyone to make this transfer, and he had no knowledge that the funds had been removed until he logged into his account on March 17, 2022 and saw that almost all of his money was gone.

52.     On March 17, 2022, Mr. Stephen contacted his financial advisor at Merrill Lynch, Anthony Joe, to report the theft. Mr. Joe conferenced in a representative from Merrill Lynch's fraud department, who instructed Mr. Stephen to go to a Bank of America branch to recall the funds. Mr. Joe also provided Mr. Stephen with a claim number: 15156.

53.     On March 17, 2022, Mr. Stephen went to a Bank of America branch in Springfield Gardens, New York, and requested to recall the wire transfer from Bank of America to Cross River Bank.

54.     On March 21, 2022, Mr. Stephen tried to contact the Merrill Lynch fraud department for an update but could not get a hold of anyone. Mr. Stephen contacted Mr. Joe, who gave Mr. Stephen another phone number to try. Mr. Stephen called the number provided by Mr. Joe and spoke with a Merrill Lynch employee named Mason Smith. Mr. Smith informed Mr. Stephen that the recall was successful and that the funds would be back in Mr. Stephen's account in 48 hours.

55.     On March 23, 2022, Mr. Stephen called Bank of America because the funds still were not in his account. Bank of America told Mr. Stephen that they did not see any claim number for his account and that the recall was not successful. Bank of America then gave him a new claim number. Bank of America and Merrill Lynch sent Mr. Stephen Scam Acknowledgment forms to fill out and return to them, which he did.

56.     On March 23, 2022, Mr. Stephen filed an FBI complaint detailing the scammers' crimes. Exhibit A pp. 9–14 (FBI complaint).

57.     Mr. Stephen has fully cooperated with law enforcement's efforts to investigate this crime. The NYPD referred Mr. Stephen's case to the Financial Crimes Task Force, and on March 30, 2022, a detective from the Task Force took two of Mr. Stephen's computers to review as evidence. The detective has since informed Mr. Stephen that they are investigating several other cases similar to his.

**Mr. Stephen's Fraud Disputes to Cross River Bank and Cross River Bank's Response**

58.     On April 6, 2022, Mr. Stephen contacted Cross River Bank with an attorney from CAMBA Legal Services, a non-profit legal services provider. Mr. Stephen spoke with an employee with Cross River Bank's Fraud Department. Mr. Stephen told the employee about the scam and the unauthorized transfers from his account. The Cross River Bank employee represented that Cross River just processes wire transfers and does not have access to Coinbase accounts. The representative said that someone from Cross River Bank's legal department would follow up with CAMBA Legal Services, but no one ever did.

59.     On June 16, 2022, Mr. Stephen sent a letter to Cross River Bank requesting that the Bank investigate his fraud claim and reimburse him for the unauthorized transfers. Exhibit A.

60.     In a letter dated September 28, 2022, Cross River Bank responded to Mr. Stephen's fraud claim, stating: "Coinbase has an account at the Bank as the Bank's customer. The Bank provides wire transfer services to Coinbase." Exhibit D. Cross River further explained that the money Mr. Stephen wired was sent to a Coinbase account held at the Bank but that the Bank did not have any information about what happened to Mr. Stephen's funds once they were moved to Coinbase's "external account." The Bank directed Mr. Stephen to contact Coinbase. Notably, the Bank's response did not explain the relationship between Cross River Bank and Coinbase or what it means for funds to be held in Coinbase's "external account." The letter also failed to detail the findings of its investigation, and it remains unclear whether the Bank performed any investigation at all.

## Mr. Stephen's Fraud Disputes to Coinbase and Coinbase's Response

61.     On April 22, 2022, Mr. Stephen submitted an online complaint to Coinbase alleging unauthorized account access and withdrawal of funds. Exhibit E. On April 23, Coinbase sent Mr. Stephen an email requesting additional information regarding the creation of the account and whether a third party had access to the account. Exhibit F. On April 28, Mr. Stephen responded to Coinbase's email and provided the information requested, explaining that scammers opened the account under his name and email address, that he could log in to the account and see his money, and that he was not aware of anyone else accessing the account. Exhibit G.

62.     On April 29, 2022, Coinbase responded to Mr. Stephen's complaint by explaining that cryptocurrency transactions are irreversible and there is no way to recover digital assets sent off its platform. Coinbase also informed Mr. Stephen that it was no longer able to provide him

any services and stated: "A variety of factors have been weighed in your case, and for security reasons we are unable to elaborate on our internal decision process." Exhibit H.

63.    On May 24, 2022, Mr. Stephen submitted another complaint to Coinbase, again detailing the scam and requesting that Coinbase reinvestigate his fraud claim and provide him with the documents upon which the denial was based. Exhibit I pp. 3–30 (May 24, 2022 letter to Coinbase).

64.    On June 10, 2022, Coinbase sent Mr. Stephen an email again declining to reimburse him. Coinbase said that an account was opened with Mr. Stephen's personal information and ID and that at the time of opening or the time of the transactions, Coinbase had no reason to suspect the activity was unauthorized. Coinbase further stated: "As this account was created using your personal information, and because Coinbase had no reason to believe this to be fraudulent, we are not liable for any unauthorized activity on this account." Exhibit I p. 31 (June 10, 2022 response from Coinbase).

65.    On June 30, 2022, Mr. Stephen sent Coinbase another letter asking Coinbase to clarify whether it had determined that the transfers were unauthorized, and if so to reimburse him for the money taken from his account. Exhibit I. Mr. Stephen again asked Coinbase to provide a written explanation of its findings and copies of the documents Coinbase relied on in making its determination. *Id.*

66.    On August 11, 2022, Coinbase sent Mr. Stephen an email stating that Coinbase had already responded to Mr. Stephen's complaint on June 10 and instructed Mr. Stephen to refer to that response, noting that Coinbase considers Mr. Stephen's complaint resolved and closed. Exhibit J.

67.     On December 14, 2022, Mr. Stephen submitted complaints against Coinbase and Cross River Bank to the New York State Attorney General and the Consumer Financial Protection Bureau ("CFPB"). In its January 27, 2023 response to Mr. Stephen's CFPB complaint, Coinbase again stated that Coinbase is not liable for any unauthorized activity on the account because the account was created using Mr. Stephen's personal information, and Coinbase had no reason to believe the account opening and transactions were fraudulent. Coinbase also quoted section 6.7 of its User Agreement, which states that users should not allow remote access to their computer and that Coinbase assumes no responsibility for any loss sustained due to account login information that is compromised through no fault of Coinbase. Exhibit K.

68.     Coinbase's refusal to reimburse customers for unauthorized transfers is not limited to Mr. Stephen. Coinbase has a policy of denying claims based on alleged consumer negligence, despite the fact that under the EFTA, negligence does not affect a consumer's liability for unauthorized transfers. As Coinbase explained in response to Mr. Stephen's CFPB complaint, its User Agreement states that it assumes no responsibility for any loss sustained when account login credentials are compromised due to no fault of Coinbase. Coinbase routinely cites consumer negligence as its basis for denying consumers' fraud claims. For example, in *Brummer v. Coinbase*, a federal lawsuit pending in the District of Minnesota, the plaintiff alleged that Coinbase responded to the plaintiff's fraud claim by stating that Coinbase was aware that unauthorized activity might have occurred on the defendant's account, but that "[c]ustomers are responsible for the security of their devices and passwords, and for any activity that occurs when those devices or passwords are compromised." Complaint ¶ 36, *Brummer v. Coinbase, Inc.*, No. 23-cv-81 (D. Minn. filed Jan. 10. 2023). Similarly, the plaintiff in *Harvey v. Coinbase, Inc.*, filed

in the Northern District of California, alleged that Coinbase acknowledged the plaintiff's account

was accessed by an "attacker," yet Coinbase disclaimed any responsibility for the hacked

account and said that the plaintiff was "solely responsible for the security of your e-mail, your

passwords, your 2FA codes, and your devices." Complaint ¶ 33, *Harvey v. Coinbase, Inc.*, No.

23-cv-81 (N.D. Cal. filed Mar. 14. 2022).

69.     Mr. Stephen did not authorize the purchase of Bitcoin from his account or the

transfer of the Bitcoin out of his account. Despite these facts, Defendants refuse to reimburse Mr.

Stephen for the funds he lost because of the fraudulent transfers.

### Mr. Stephen has Experienced Emotional, Physical, and Financial Distress due to Defendants' Conduct.

70.     As a result of the scam and Defendants' refusal to reimburse him for the loss of

his life's savings, Mr. Stephen has suffered significant emotional and physical distress. He often

feels depressed, he has harbored suicidal thoughts and he has had to seek counsel from his pastor

and his daughter, who is a psychiatrist. He worries constantly about how he will pay his bills and

support himself and his wife in retirement. He has trouble sleeping and when he does sleep, he

has nightmares and often wakes with a headache. Mr. Stephen's physical health has also

deteriorated since the start of this ordeal. His blood pressure and blood sugar levels have both

increased, leading Mr. Stephen's doctor to prescribe him medication for high blood pressure and

diabetes, which he is now taking. He is also experiencing tinnitus.

71.     Defendants' actions have also caused Mr. Stephen significant financial distress.

Mr. Stephen worked for decades to save enough money for retirement. He retired at 65 because

of a back injury, but thought he had saved enough money to afford to retire. After losing all of

the money he had carefully saved, he has found it difficult to afford basic needs, such as his

medications, and he has racked up credit card debt to pay for expenses such as necessary dental

work. He is now looking for a job and has enrolled in a course to acquire the certifications necessary to return to work. But at 70 years old, Mr. Stephen has not yet found a job and worries that his age will be an obstacle to reentering the workforce.

72.    Mr. Stephen's emotional distress, high blood pressure, and sleeping problems continue up to the present.

**FIRST CLAIM FOR RELIEF**
Violations of the Electronic Fund Transfer Act, 15 U.S.C. § 1693 *et seq.*
(As to all Defendants)

73.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs with the same force and effect as though fully set forth herein.

74.    This claim arises under the Electronic Fund Transfer Act ("EFTA") and its implementing regulations because it relates to unauthorized and fraudulent electronic transfers from Mr. Stephen's account. Mr. Stephen has a cause of action under the EFTA because the fraudulent transfers constitute unauthorized electronic fund transfers as defined by the statute. Under the EFTA, Mr. Stephen bears no liability for unauthorized transfers and his dispute of the fraud on his account imposed on Defendants investigation requirements that they failed to perform.

75.    The Electronic Fund Transfer Act of 1978, 15 U.S.C. § 1693 *et seq.*, is intended to protect individual consumers engaging in electronic fund transfers. *See* § 1693(b). Its implementing regulations, known as Regulation E, are found in Part 205 of Subchapter A of Chapter II of Title 12 of the Code of Federal Regulations and Part 1005 of Chapter X of Title 12 of the Code of Federal Regulations. *See* 12 C.F.R. §§ 205.1(a), 1005.1(a).

76.    The EFTA defines an "electronic fund transfer" as "any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated

through an electronic terminal, telephonic instrument, or computer or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, direct deposits or withdrawals of funds, and transfers initiated by telephone." 15 U.S.C. § 1693(a)(7).

77.    An "unauthorized electronic fund transfer" is defined as "an electronic fund transfer from a consumer's account initiated by a person other than the consumer without actual authority to initiate such transfer and from which the consumer receives no benefit," § 1693a(12), except for an electronic transfer "(A) initiated by a person other than the consumer who was furnished with the card, code, or other means of access to such consumer's account by such consumer, unless the consumer has notified the financial institution involved that transfers by such other person are no longer authorized, (B) initiated with fraudulent intent by the consumer or any person acting in concert with the consumer, or (C) which constitutes an error committed by a financial institution." *Id*. The term "unauthorized electronic fund transfer" includes a transfer that is initiated by someone who obtained the access device from the consumer through fraud or robbery. 12 C.F.R. § 205.2(m), Supp. I (Official Staff Interpretation on § 205.2(m)(3), (4)); 12 C.F.R. § 1005.2(m), Supp. I (Official Staff Interpretation on § 1005.2(m)(3), (4)).

78.    A "financial institution" is defined by the EFTA, 15 U.S.C. § 1693a(9), and Regulation E, 12 C.F.R. §§ 205.2(i), 1005.2(i), to include a bank or any person that directly or indirectly holds a consumer's account, or that issues an access device and agrees to provide a consumer with electronic fund transfer services.

79.     An "account" is defined as a "[c]hecking, savings, or other consumer asset account…held directly or indirectly by a financial institution and established primarily for personal, family, or household purposes." 12 CFR § 1005.2(b)(1).

80.     An "access device" is defined as "a card, code, or other means of access to a consumer's account, or any combination thereof, that may be used by the consumer to initiate electronic fund transfers." 12 C.F.R §§ 205.2(a)(1), 1005.2(a)(1).

81.     Under the EFTA, if the consumer's access device is lost or stolen, the consumer's liability for unauthorized use may not exceed $500. 15 U.S.C. § 1693g(a); Reg. E, § 1005.6(b). If the unauthorized transfer does not involve a lost or stolen access device, then the consumer bears no liability. *See* Reg. E, Official Interpretations § 1005.6(b)(3)-2. Consumer negligence does not affect these limitations on the consumer's liability for unauthorized transfers. Reg. E, Official Interpretations § 1005.6(b)-2.

82.     Under the EFTA, financial institutions must investigate a consumer's claims of error, which include claims of unauthorized electronic fund transfers, determine whether an error has occurred, and report or mail the results of its investigation and determination to the consumer within ten days. 15 U.S.C. § 1693f(a). In the alternative, the financial institution may provisionally credit the consumer's account pending the conclusion of its investigation. 15 U.S.C. § 1693f(c). The financial institution must complete its investigation within 45 days of receipt of the notice of error. *Id.*

83.     If a financial institution determines that an error occurred, it must correct the error within one business day. 15 U.S.C. § 1693f(b).

84.     If a bank denies a claim of error, it must explain its findings and provide notice of the consumer's right to request documents relied on in its investigation. 15 U.S.C. § 1693f(d); 12

C.F.R. §§ 205.11(d), 1005.11(d). Upon the consumer's request, the financial institution must provide the consumer with copies of the documents it relied upon in its investigation. *Id.*

85.    On March 8, 2022, Mr. Stephen transferred his money to a Coinbase account at Cross River Bank that the scammers had opened in his name. From there, two unauthorized electronic fund transfers were made from Mr. Stephen's account. First, the fraudsters accessed Mr. Stephen's account and made unauthorized Bitcoin purchases; in doing so, the fraudsters transferred the funds from Mr. Stephen's USD Wallet to a Digital Asset Wallet. Second, the fraudsters accessed Mr. Stephen's account and made an unauthorized transfer from Mr. Stephen's Digital Asset Wallet to an unknown account at L Bank.

86.    Defendants violated the EFTA and Regulation E. Their violations include, but are not limited to, the following: holding Mr. Stephen liable for the unauthorized transfers, failing to conduct reasonable investigations, failing to report the results of their investigations within ten business days or in the alternative failing to provisionally credit Mr. Stephen's account and complete the investigations within 45 days, and failing to provide documentation regarding their investigations.

87.    On April 22, 2022, Mr. Stephen submitted a complaint online through Coinbase Support. Coinbase denied Mr. Stephen's complaint on April 29, 2022, stating that Coinbase had no way to cancel, reverse or recover digital assets sent off its platform. Exhibit H.

88.    Mr. Stephen submitted another complaint to Coinbase on May 24, 2022. He submitted the complaint through Coinbase's online dispute process, and sent an additional copy to Coinbase by mail. Coinbase denied his complaint 17 days later, on June 10, stating that because the account was opened using Mr. Stephen's personal information and Coinbase had no reason to think the account opening or transactions were unauthorized, Coinbase was not liable

for any unauthorized activity. Exhibit I p. 31. Mr. Stephen sent Coinbase a follow up letter dated June 29, 2022 asking for additional information regarding Coinbase's investigation and findings, including whether Coinbase had concluded that the transfers were authorized as well as the documents Coinbase relied on in making its determination. Coinbase refused to provide any further information, replying on August 11, 2022 that it had already responded to Mr. Stephen's complaint on June 10 and that Coinbase considered the complaint resolved and closed. Exhibit J.

89.    Coinbase's denial letters are wholly deficient and demonstrate that Coinbase did not conduct a reasonable investigation. Under the EFTA, whether Coinbase had reason to believe the transactions were unauthorized is immaterial. If a financial institution wishes to avoid liability for a transfer, it must demonstrate that the transfer was actually authorized by the consumer. *See* 15 U.S.C. § 1693g(b). Coinbase did not report its findings and neither reimbursed Mr. Stephen for the unauthorized transactions, nor demonstrated or even claimed that the transactions were authorized. Coinbase also did not notify Mr. Stephen of his right to request documents Coinbase relied on in its investigation, and failed to provide these documents even after Mr. Stephen requested them. Coinbase's actions violated 15 U.S.C. §§ 1693f and 1693g and 12 C.F.R. §§ 205.6, 205.11, 1005.6, and 1005.11.

90.    Cross River Bank also violated the EFTA. Mr. Stephen first reported the unauthorized transfers during a telephone call to Cross River Bank's Fraud Department on April 6, 2022. Despite the Cross River Bank employee's representation that someone in the legal Department would follow up about his case, no one ever did. Mr. Stephen followed up with a written dispute dated June 16, 2022. Cross River Bank did not respond until September 28, 2022, 104 days after Mr. Stephen sent his letter and 176 days after Mr. Stephen first called to report the unauthorized transfers. Cross River Bank did not conduct a reasonable investigation, instead

stating that Mr. Stephen's money was sent to Coinbase's account held at Cross River Bank, but that the Bank did not have information about what happened once the funds were sent to Coinbase's "external account" and that Mr. Stephen should contact Coinbase for assistance. Cross River Bank did not explain what it means for funds to be held in Coinbase's "external account," it did not provide any other information about its investigation, and it did not notify Mr. Stephen of his right to any documentation and did not provide any documentation, even when it was requested. Cross River Bank's actions violated 15 U.S.C. §§ 1693f and 1693g and 12 C.F.R. §§ 205.6, 205.11, 1005.6, and 1005.11.

91.    As a direct and proximate result of Defendants' violations of the EFTA and Regulation E, Mr. Stephen has suffered compensable harm including actual damages in an amount not less than $140,195, emotional distress, and any other damages as may be determined by the Court. Mr. Stephen is entitled to recover actual damages under the EFTA, 15 U.S.C. § 1693m(a)(1), plus an additional sum of from $100 to $1000, § 1693m(a)(2)(A), plus the costs of the action and a reasonable attorney's fee, § 1693m(a)(3). Because Defendants did not make a good faith investigation of Mr. Stephen's fraud claims and lacked a reasonable basis for denying his claims, Mr. Stephen is also entitled to recover treble damages. *See* 15 U.S.C. § 1693f(e).

**SECOND CLAIM FOR RELIEF**
N.Y. Gen. Bus. Law § 349
(As to all Defendants)

92.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs with the same force and effect as though fully set forth herein.

93.    New York prohibits "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state […]" N.Y. Gen. Bus. Law § 349(a).

94.     An individual "injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such actions." N.Y. Gen. Bus. Law § 349(h).

95.     Defendants violated § 349 of the New York General Business Law by using deceptive acts and practices in the conduct of their businesses.

96.     Coinbase's violations include, but are not limited to, misrepresenting to Mr. Stephen that he was responsible for the fraud because it was caused by his own negligence and because Coinbase had no reason to know the transactions were unauthorized. Coinbase's representations are deceptive because consumer negligence and Coinbase's knowledge as to whether transactions are unauthorized does not affect the consumer's liability for unauthorized transfers under the EFTA.

97.     Coinbase's conduct has a broad impact on consumers at large and is directed toward consumers at large.

98.     Coinbase has a pattern and practice of denying fraud investigations based on the consumer's alleged negligence. As Coinbase stated in its response to Mr. Stephen's CFPB complaint, its own User Agreement states that it assumes no responsibility for any loss sustained due to compromise of account login credentials due to no fault of Coinbase. *See* Exhibit K. As detailed above, Coinbase routinely cites consumer negligence as a basis for denying consumers' unauthorized transfer claims. *See supra* ¶ 68. Upon information and belief, Coinbase also has a pattern and practice of denying fraud investigations on the basis that Coinbase did not know the transactions were unauthorized.

99.     Cross River Bank's violations of General Business Law § 349 include, but are not limited to, misrepresenting to Mr. Stephen that even though he transferred his money to an account at the Bank, Cross River bears no liability for unauthorized transfers from the account and is not obligated to conduct an investigation in accordance with the EFTA.

100.    Cross River Bank's conduct has a broad impact on consumers at large and is directed toward consumers at large.

101.    Upon information and belief, Cross River Bank has a pattern and practice of denying fraud investigations based on its position that it is not liable for unauthorized transfers from Coinbase accounts held at Cross River Bank and that such claims of error do not impose on the Bank an obligation to conduct investigations in accordance with the EFTA.

102.    Both Coinbase and Cross River Bank provide these explanations to consumers in their investigation letters, which upon information and belief, are form letters. Defendants' misrepresentations cause consumers to stop pursuing their fraud complaints and stop seeking the redress to which they are entitled under the EFTA.

103.    Defendants' violations were willful and knowing or, at a minimum, evidence a conscious and reckless disregard for basic fairness and the law. Defendants knew, or should have known, their investigatory obligations under the EFTA as well as the limited circumstances under which consumers may be held liable for unauthorized electronic transfers.

104.    As a direct and proximate result of Defendants' violations of General Business Law § 349, Mr. Stephen has sustained actual damages, including emotional distress and an out of pocket loss of at least $140,195.00, plus such other damages as may be determined by the Court. Mr. Stephen is also entitled to receive treble damages, punitive damages, injunctive relief, attorneys' fees and costs. N.Y. Gen. Bus. Law § 349(h).

## THIRD CLAIM FOR RELIEF
### N.Y. U.C.C. Art. 4-A
(As to all Defendants)

105.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs with the same force and effect as though fully set forth herein.

106.     To the extent that any of the transfers at issue here are not governed by the EFTA, they are governed by New York Uniform Commercial Code Article 4-A. *See* N.Y. U.C.C. § 4-A-108(1); Reg. E, Official Interpretations § 1005.3(c)(3).

107.     Under N.Y. U.C.C. § 4-A-204(1), the bank bears the loss of unauthorized payment orders. N.Y. U.C.C. § 4-A-202(2) states an exception to this rule and provides that the customer will bear the loss for unauthorized transfers if the bank and customer have agreed that the bank will verify the authenticity of payment orders pursuant to a security procedure and "(a) the security procedure is a commercially reasonable method of providing security against unauthorized payment orders, and (b) the bank proves that it accepted the payment order in good faith and in compliance with the security procedure and any written agreement or instruction of the customer restricting acceptance of payment orders issued in the name of the customer." N.Y. U.C.C. § 4-A-202(2).

108.     First, in order for this exception to apply, there must be a security procedure agreed to by the customer and the receiving bank for the purpose of verifying that a payment order is that of the customer or detecting error in the payment order. N.Y. U.C.C. § 4-A-201. Procedures the bank follows unilaterally when processing payment orders do not constitute an agreed security procedure. N.Y. U.C.C. § 4-A-201 cmt.

109.     Second, the security procedure must be commercially reasonable, which is a question of law to be determined based on the wishes of the customer expressed to the bank, the

customer's circumstances known to the bank including the size, type, and frequency of payment orders normally issued by the customer, alternative security procedures offered to the customer, and security procedures generally used by similarly-situated customers and banks. N.Y. U.C.C. § 4-A-202(3).

110.    Third, the bank must prove that it accepted the payment order in good faith and in compliance with the security procedure. N.Y. U.C.C. § 4-A-202(2). "Good faith" means "honesty in fact and the observance of reasonable commercial standards of fair dealing." § 4-A-105(f).

111.    If the elements of the exception to the default rule are not met – in other words, there was no agreed-to security procedure, or the security procedure is not commercially reasonable or the bank did not accept the payment order in good faith – then the bank is liable for the lost funds.

112.    Defendants are liable for the fraudulent transfers from Mr. Stephen's account under N.Y. U.C.C. § 4-A-204(1).

113.    The exception to the default rule provided in § 4-A-202(2) does not apply to this case because Mr. Stephen did not agree to a security procedure. The fraudsters set up an account under Mr. Stephen's name but Mr. Stephen was not involved in the creation of the account and did not consent to any account agreement or terms. He did not make any fund transfers from his account and did not agree to any security procedure for fund transfers. As a result, the exceptions laid out in N.Y. U.C.C. § 4-A-202(2) do not apply and Defendants are liable for the fraudulent transfers under § 4-A-204(1).

114.    In addition, Defendants' security procedures are not commercially reasonable. To begin with, Cross River Bank has not provided any information regarding the transfers and has

repeatedly referred Mr. Stephen to Coinbase; it remains unclear whether Cross River Bank utilizes any security procedures of its own or relies on Coinbase's security procedures. And while it is not clear what security procedure, if any, Coinbase employs, it is evident that its procedures are not commercially reasonable because they do not allow customers to contact a live human being, rendering it impossible for customers to adequately flag suspicious activity on their accounts, restrict access to their accounts, or prevent unauthorized transfers from their accounts. When Mr. Stephen started to suspect fraud, he called the phone number he found on the Coinbase website, but he was not able to speak with a human being and instead encountered an automated process that directed him to the Coinbase website. He was left with no choice but to use Coinbase's online complaint process to place a restriction on his account. Because Mr. Stephen was not able to speak with someone at Coinbase regarding his account security concerns, he was under the false impression that his funds were safe and that his account would remain frozen until he unlocked it. This was not the case, and the fraudsters were able to lift the restriction and remove all of the Bitcoin from Mr. Stephen's account. Coinbase's security procedures are not commercially reasonable because they fail to provide real time human support that could prevent unauthorized transfers like the ones here from occurring. Since the security procedure must be commercially reasonable for the exception to the bank's liability to apply, Defendants are liable for the fraudulent transfers under N.Y. U.C.C. § 4-A-204(1). *See* N.Y. U.C.C. § 4-A-202(2).

115.    Finally, Defendants did not act in good faith because they did not observe reasonable commercial standards of fair dealing in accepting the fraudulent transfers. Coinbase has alleged in media reports that "its investigation team often conducts additional reviews of transactions associated with accounts belonging to seniors because of the high rate of wire fraud

targeting this group." Isabel Contreras, *Crypto Crime Stopper: How Coinbase Foiled The Theft Of A Half Million From An Elderly Man's Bank Accounts*, FORBES, Jan. 6, 2022, *available at* https://www.forbes.com/sites/isabelcontreras/2022/01/06/crypto-crime-stopper-how-coinbase-foiled-the-theft-of-a-half-million-from-an-elderly-mans-bank-accounts/?sh=2aeb2a386459. Financial institutions such as Coinbase are also supposed to flag possible instances of "Elder Financial Exploitation" on suspicious activity reports (SARs) filed with the Financial Crime Enforcement Network. *Id.* Mr. Stephen is a 70-year-old retiree who has never had a Coinbase account or purchased cryptocurrency. The fraudsters opened an account under Mr. Stephen's name and within a matter of days, $140,200 was deposited into the account, almost all of the money was used to purchase Bitcoin, and then all of the Bitcoin was removed from Mr. Stephen's account and sent to a cryptocurrency exchange based overseas. Before the Bitcoin was transferred out of his account, Mr. Stephen changed his password and placed a restriction on the account. One day after Mr. Stephen placed a restriction on the account, the fraudsters contacted Coinbase Support for assistance because the account sending option was restricted. According to the Coinbase activity report, there were also numerous failed attempts to log in to Mr. Stephen's account, several of which occurred on the same day. Despite all of these red flags, Defendants failed to detect and stop the fraudulent transfers. Defendants did not accept the fraudulent payment orders in good faith, and are liable for the transfers under § 4-A-204(1).

116.    As a direct and proximate result of Defendants' violations of N.Y. U.C.C. Art. 4-A, Mr. Stephen has sustained actual damages equal to at least $140,195.00, plus such other damages as may be determined by the Court. Mr. Stephen is entitled to recover the amount of the fraudulent transfers, or $140,195.00, under N.Y. U.C.C. § 4-A-204(1), plus interest, as calculated from the date of the fraudulent transfers until the reimbursement of the funds.

## FOURTH CLAIM FOR RELIEF
Negligence per se – EFTA and GBL § 349
(As to all Defendants)

117.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs with the same force and effect as though fully set forth herein.

118.    Defendants owed Mr. Stephen a duty pursuant to the EFTA, which is designed to protect consumers in part by imposing a duty on financial institutions like Defendants to conduct investigations of consumers' claims of error in electronic fund transfers, release consumers from liability for unauthorized electronic fund transfers, provide consumers with an explanation when claims are denied, and provide consumers with documentation regarding denial of their fraud claims.

119.    GBL § 349 also imposes on Defendants a duty to not engage in deceptive acts and unlawful practices in the conduct of their business.

120.    Defendants breached these duties by failing to bear the loss of the unauthorized transfers; failing to conduct reasonable investigations of Mr. Stephen's claims of error; failing to provide sufficient explanations for denying his claims; failing to provide Mr. Stephen with documentation regarding the denial of his claims; and engaging in deceptive acts and unlawful practices in the conduct of their businesses.

121.    As a direct and proximate result of Defendants' breach of these duties, Mr. Stephen suffered compensable harm, including actual damages and emotional distress.

122.    Defendants' conduct was so flagrant as to transcend mere carelessness and constitute willful negligence or recklessness. Upon information and belief, Defendants have engaged in a pattern and practice of similar behavior against other consumers. As a result, Mr. Stephen is entitled to actual and punitive damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that his Court:

1.      Enter judgment for Plaintiff on all causes of action;

2.      Enter an injunction requiring Defendants to comply with the Electronic Fund Transfer Act and to train their employees accordingly;

3.      Award actual, statutory, consequential, and punitive damages to the Plaintiff;

4.      Award reasonable attorneys' fees and costs to the Plaintiff, and

5.      Award such other and further relief as may be just, equitable, and proper.

## **JURY DEMAND**

Plaintiff respectfully requests a trial by jury.

Dated: Brooklyn, New York
         February 27, 2023

                    Respectfully submitted,

                    By: *Melissa Koven*

                    CAMBA LEGAL SERVICES, INC.
                    Melissa Koven, Of Counsel
                    Matthew Schedler, Of Counsel
                    Divya Subrahmanyam, Of Counsel
                    Elizabeth Miller, General Counsel
                    20 Snyder Ave.
                    Brooklyn, NY 11226
                    Phone: (718) 940-6311
                    MelissaK@camba.org